UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

KENNETH MOORE and
JOSHUA MOORE,

*Defendants*.

10 Cr. 971 (RJH)

**MEMORANDUM ORDER AND OPINION**

Richard J. Holwell, *District Judge*:

Defendant Joshua Moore seeks suppression of two handguns that comprise the physical evidence in the government's criminal case against him.[1] These weapons were found in the backseat of a livery cab in which the defendant was a passenger, after police officers stopped it, purportedly for committing a traffic violation. Two of the three police officers who conducted the stop and subsequent search of the vehicle stated during an evidentiary hearing, held before the Court on June 28, 2011, that they stopped the car on suspicion that it was "traveling at a high rate of speed" in violation of New York's traffic laws. Suppression Hearing Transcript ("Tr.") at 19:23–24, 37:9 (June 28, 2011). The defendant argues that the stop was not supported by reasonable suspicion of a traffic violation. For the reasons stated below, the Court agrees, and the physical evidence seized as a result of the stop is suppressed.

[1] Kenneth Moore—the defendant's brother and co-defendant in this matter—arrived at a plea agreement with the government.

## BACKGROUND

During the June 28 suppression hearing, the Court heard testimony from two members of the New York Police Department ("NYPD") who were present when the defendant was arrested.

Sergeant Kevin Whelan testified that on the date of the incident, he was assigned to the Patrol Borough Bronx Anti-Crime Unit. Tr. 3:8–9. He outlined the responsibilities of that unit by describing it as a "plainclothes team that's involved in proactive policing in areas throughout the Bronx . . . for areas of violent felonies and high homicide rates." Tr. at 3:11–14. Sergeant Whelan testified that during the course of his career, he has been involved in approximately 400 arrests and thirty to forty gun arrests. Tr. 4:1–5. He did not describe how much experience he had had conducting traffic stops or estimating the speeds of traveling cars. Because the primary duties of an anti-crime officer are to respond to violent felonies rather than to enforce traffic laws, Sergeant Whelan stated that he did not have a book of summonses that he could issue on the night in question. Tr. at 21:10–17.

On the night of June 9, 2009—the night of the defendant's arrest—Sergeant Whelan was driving an unmarked police car in which Officer Brian Brannigan and Officer James Whitlock, who did not testify, were passengers. Tr. at 5:17–22, 29:20–22. Their car was parked at the intersection of 149th Street and Exterior Drive in the Bronx, directly across from the 145th Street Bridge.[2] Tr. at 5:25–6:1, 7:15–17. The car was facing north, and Sergeant Whelan could see the off-ramp from the bridge directly to his left. Tr. at 16:5–6, 15-16. At approximately 11:30 p.m., he observed a livery cab coming over the bridge towards the Bronx "at a high rate of speed." Tr.

[2] The bridge in question is named the 145th Street Bridge because it extends from 145th Street in Manhattan. When it crosses into the Bronx, it flows into 149th Street.

at 7:17–23, 29:23–24. On cross-examination, Sergeant Whelan clarified that, in his estimation, the car was traveling "in excess of the speed limit." Tr. 26:13–14. Notably, when he first observed the vehicle, it was approximately thirty feet from the intersection where he was parked. Tr. at 18:2–6. After the livery cab crossed the bridge, it made a right-hand turn onto Exterior Drive and disappeared behind Sgt. Whelan. Tr. at 8:1–4.

At that point, Sgt. Whelan decided to pull over the cab. He stated at the hearing that the reason he did so was that in his experience, livery cab drivers will often "make blatant traffic infractions in order to draw attention to their cabs so that they can in fact be pulled over by the police if they have passengers in the car that they don't feel comfortable with." Tr. at 28:12–15. He stated that drivers would use such "blatant . . . infractions" instead of using a yellow emergency light that lights up on the tail of the car because they do not want to alert their passengers that they are attempting to draw the attention of the police. Tr. at 28:10–23.

Sergeant Whelan did not specify which "blatant traffic infraction" sparked his suspicion in this case. On direct testimony, he mentioned only the fact that the cab was driving at a "high rate of speed." Tr. at 7:19–20. Under cross-examination, Segeant Whelan also seemed to suggest that the cab was straddling two lanes as it crossed the bridge. *See* Tr. at 18:16–17 ("It's a double lane, so he was probably in the middle of both lanes as he was making the turn."). However, the government does not seek to justify the traffic stop on this basis.

Once he decided to pull over the livery cab, Sergeant Whelan made a u-turn and turned on the police lights and siren of his vehicle. Tr. at 8:8–19. The police officers drove two blocks and then, having caught up, stopped the cab. Tr. at 9:8–10. Sergeant Whelan was remarkably

unspecific in describing how fast he had to drive in order to catch up with the cab. His interchange with defense counsel at the suppression hearing was as follows:

> Q. How long a period of time did it take you from the time that you observed him make the right turn and start heading south on Exterior for you to make the U-turn and pull over?
>
> A. I would say about 10, 15 seconds.
>
> Q. Do you know how fast you were driving.
>
> A. I was definitely driving at a good rate of speed to catch back up to the livery cab.
>
> Q. When you say a good rate of speed, what do you mean?
>
> A. The speed limit in New York City is 30 miles an hour. I probably was going over the speed limit of 30 miles an hour to catch up to the livery cab.
>
> Q. How fast were you going?
>
> A. I would say approximately over 30 miles an hour.
>
> Q. Were you going over 40 miles an hour?
>
> A. I can't say.
>
> Q. 50 miles an hour?
>
> A. I wasn't looking at the speedometer.
>
> Q. You weren't going 60 miles an hour, were you?
>
> A. No.
>
> Q. Could you have been going 50 miles an hour?
>
> A. Whatever amount of speed it took me to catch up to the livery cab was the speed I was going.
>
> Q. That's what I'm asking[.]
>
> A. Which in my professional opinion I would refer to as a high rate of speed.

Tr. 18:25–19:24.

After the cab stopped, Sergeant Whelan exited his vehicle and approached the driver, stating that he did not do so because he was primarily concerned for the driver's safety. Tr. at 28:4–6. He did not ask for the driver's license and registration immediately upon stopping him,

though he did eventually record this information after the defendants—two brothers who were riding as passengers in the back seat—were arrested.[3] Tr. at 21:4–9. Sergeant Whelan attempted to ask the driver whether he was concerned about his passengers, but he was unable to do so because there was a language barrier. Tr. at 31:3–6, 32:1–6.

After attempting to speak with the driver, Sergeant Whelan opened the rear passenger door on the driver's side of the vehicle and saw a gun on the floor of the cab. Tr. at 9:3–5. He stated that it appeared that someone had attempted to shove the gun under the driver's seat. Tr. at 22:16–22. The gun was black and "shiny silver." Tr. at 22:10–13. When he saw the gun, Sergeant Whelan asked the defendant seated closest to him to step out of the cab and frisked him to determine whether he had any further weapons on his person.[4] Tr. at 9:7–10. He then heard Officer Whitlock give the signal that there was a gun in the car and placed the individual in handcuffs. Tr. at 9:10–12.

At the June suppression hearing, the Court also heard testimony from Officer Brannigan. Officer Brannigan stated that over the course of his career, he has been involved in "hundreds" of arrests and over twenty gun arrests. Tr. at 34:5–9. He did not describe his experience in enforcing speeding violations or in identifying the speed of vehicles by sight.

Officer Brannigan's description of the night in question is largely in accordance with the description of Sergeant Whelan. He stated that he was sitting in the middle of the back seat of the car, Tr. at 42:6–15, and that he saw the livery cab come over the 145th Street Bridge at a

[3] Sergeant Whelan never issued the driver a speeding ticket. Tr. at 21:10–11.

[4] During his testimony, Sergeant Whelan referred to this individual as "Mr. Moore." Tr. at 9:7–12. On cross-examination, however, he stated that he was unable to identify which defendant was Joshua Moore and which was Kenneth Moore. Tr. at 25:10–12.

"high rate of speed." Tr. at 37:7–9. As the car came to the end of the ramp, the cab driver applied the brakes, and the cab slowed down to make a right-hand turn. Tr. at 41:19–24. Officer Brannigan testified that as the cab slowed down, he saw the passenger behind the driver leaning over. Tr. at 37:10–11. He then stated that the car subsequently "sped off," traveling south down Exterior Drive. Tr. at 37:11–19. Officer Brannigan did not hear the sound of squealing tires as the car sped off, despite the fact that his window was open. Tr. at 42:2–5. According to Officer Brannigan, the officers' vehicle made a u-turn and traveled "a couple of seconds" to catch up to the cab, or "a couple of city blocks." Tr. at 37:23–24. After the officers caught up to the cab, they activated their lights and siren, and the car pulled over "right away." Tr. at 37:24–25, 41:13–18. Officer Brannigan stated that he saw the passengers look at the police car after they turned on their lights and siren. Tr. 41:10–12.

After the cab pulled over, Officer Brannigan approached the passenger side of the cab and opened the door, asking the passenger in the back seat to step out of the car. Tr. at 38:11–14. He patted the passenger down "for [his] safety." Tr. at 38:14. Next, Officer Brannigan heard one of his fellow officers say the word "lunch," a code word the officers would use to indicate that they had seen a weapon. Tr. at 38:14–15, 21–22. Officer Brannigan then placed the passenger in handcuffs and searched the back seat of the car for the gun he had seen, and he found the gun under the back passenger seat of the car. Tr. at 38:15, 38:24–39:13. The handle of the gun was visible, and the rest was pushed under the front passenger-side seat. Tr. at 47:1–9.

## DISCUSSION

I. Governing Law

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be unreasonable under the circumstances." *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005). "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994). Because "[a]n ordinary traffic stop constitutes a limited seizure within the meaning of" the Fourth Amendment, "such stops must be justified by probable cause or a reasonable suspicion." *Id.* at 781 (citations and internal quotation marks omitted).

At a suppression hearing, the government bears the burden of proving, by a preponderance of the evidence, that the evidence was lawfully obtained. *See United States v. Heath*, 455 F.3d 52, 69 (2d Cir. 2006).

II. Application

The government argues that the officers' stop of the livery cab in which the defendant was a passenger was justified because they observed the cab traveling at a rate of speed higher

than the New York City speed limit of thirty miles per hour.[5] The defendant argues that the officers did not testify with sufficient factual detail for the Court to find that they had probable cause to stop the cab based on its speed. In support of that argument, the defendant notes that the officers did not measure the cab's speed with a radar gun prior to stopping it, but instead estimated the car's speed by the naked eye, and that the officers' testimony at the suppression hearing suffered from vagueness regarding how they came to the conclusion that the car was speeding. These facts, the defendant says, do not support a finding that the police had probable cause to stop the defendant's cab for traveling over the speed limit and, therefore, the fruit of the subsequent seizure should be suppressed.

In support of the proposition that these facts are not sufficient for the Court conclude that the defendant was in a speeding cab, the defendants cite *People v. Olsen*, 239 N.E.2d 354 (N.Y. 1968). There, the New York Court of Appeals adopted a common-sense framework for determining when an officer's observations, unaided by a device like a radar gun, that a car was speeding are sufficient to sustain a conviction for speeding. The court reasoned that in an instance where an officer estimated that a car was traveling fifty to fifty-five miles per hour in a thirty-miles-per-hour zone, this observation would most likely be sufficient to sustain a conviction because it is not difficult for the naked eye to discern that the car was traveling by such a great degree above the speed limit. *See id*. at 355. By contrast, the court concluded, if the same officer testified that the car was traveling thirty-five to forty miles per hour in the same

[5] The Court notes that, at oral argument, the government conceded under questioning from the Court that any purported justification for the stop based on the officers' stated concern for the safety of the driver was irrelevant to the Court's consideration of whether the officers reasonably believed the cab was speeding. In other words, if the government has not met its burden as to establishing the reasonability of the officers' observation of a traffic violation, the evidence must be suppressed.

zone, that observation might not be sufficient "since it may be assumed that only a mechanical device could detect such a slight variance with sufficient accuracy to satisfy the burden necessary to sustain a conviction." *Id.* The court further observed that a "trial court's decision to credit such testimony should be based upon all the facts and circumstances of the case, including the nature and extent of the opportunity which the officer had to view the moving vehicle." *Id.*

At the outset, the Court notes that in *Olsen*, the Court of Appeals was describing when an officer's unaided observations would be sufficient to support a *conviction* for speeding. Here, by contrast, the question before the Court is whether such observations are sufficient to demonstrate that the officers had probable cause to stop a vehicle. That is not a minor distinction. *Cf. United States v. Monzon-Gomez*, 244 F. App'x 954, 959 n.3 (11th Cir. 2007) (unpublished) ("With regard to traffic stops under the Fourth Amendment, the question is simply whether a law enforcement officer has sufficient cause to believe that a traffic law has been violated, not whether such a violation can be successfully prosecuted in court."). However, while it is firmly established that "the standard for probable cause is lower than that for conviction," *United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008); *accord United States v. Ventresca*, 380 U.S. 102, 107–08 (1965), federal courts appear to take a similar approach to the New York Court of Appeals in *Olsen* when determining whether an officer's unaided observations were sufficiently reliable to merit a conclusion that an officer has probable cause to stop a vehicle for speeding.

By far, the most common situation in which courts determine that an officer had probable cause to stop a vehicle for driving in excess of the speed limit (where the officer did not use a radar gun) is when the officer "paced" the vehicle. When officers pace a vehicle, they estimate the other vehicle's speed by matching it with their own car. Many federal courts have

determined that an officer had probable cause to stop a vehicle for speeding after pacing the vehicle. *See, e.g.*, *United States v. Puckett*, 422 F.3d 340, 342–43 (6th Cir. 2005); *United States v. Garrido-Santana*, 360 F.3d 565, 571–72 (6th Cir. 2004); *United States v. White*, 81 F.3d 775, 777–78 (8th Cir. 1996); *United States v. Stapleton*, 10 F.3d 582, 583–84 (8th Cir. 1993); *United States v. Mohamed*, 546 F. Supp. 2d 1324, 1330 (M.D. Fla. 2008). In contrast, the officers here made no attempt to pace the cab before stopping it. Furthermore, at the suppression hearing, when questioned by defense counsel, they were unable to estimate—even roughly—how fast they were going in order to catch up to the cab.

Courts also will credit the observations of officers that a car was speeding when the officer has had special training in detecting the speeds of vehicles. *See, e.g.*, *United States v. Lork*, 132 F. App'x 34, 35 (5th Cir. 2005) (unpublished) ("Based on the testimony and the police officer's training and experience, we conclude that he did have probable cause to stop [the defendant] for speeding."); *United States v. Sanchez-Palomino*, No. 09 Cr. 94, 2011 WL 703661, at *11 (E.D. Cal. Feb. 18, 2011) (crediting officers' testimony that a car was speeding based on "their vast highway interdiction and police experience" and because the officers paced the vehicle before stopping it); *United States v. Parker*, No. 10 Cr. 133, 2011 WL 1099863, at *10–*11 (E.D. Tenn. Feb. 14, 2011) (crediting, in a probable-cause inquiry, an officer's testimony that a defendant's vehicle was speeding based on the officer's "experience[ and] observations on the night in question, and the time period in which it took his vehicle to catch up" to the defendant"); *United States v. Griffin*, No. 10 Cr. 16, 2010 WL 6815894, at *3 (N.D. Ga. Sept. 8, 2010) (concluding that an officer's testimony that the defendant's car "was driving in excess of the speed limit[]" was credible "based on [the officer's] observation that the [vehicle] was

passing by other vehicles, his experience in training in visual estimations of speed, and his observation of the [vehicle's] speed while he 'paced' it"); *United States v. Ervin*, No. 07 Cr. 9, 2007 WL 2156703, at *2 (M.D. Tenn. July 25, 2007) (crediting an officer's testimony that the defendant was speeding based on the officer's "training and experience in estimating the speed of moving vehicles and making traffic stops"); *cf. United States v. Arvizu*, 534 U.S. 266, 272 (2002) (explaining that the totality-of-the-circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

By contrast, here, there is no suggestion that the officers have received any such training. Moreover, nothing about the officers' experience—nor their assigned duties on the night in question—suggests that they would have had the opportunity to become adept at estimating the speeds of vehicles. It seems likely that some police officers—such as state troopers who, as part of their regular duties, routinely estimate how fast particular cars are driving and test such an estimate by using a radar gun—might become very adept at judging a car's speed. Here, however, the Court has no such reason for confidence, based on the officers' training or experience as introduced during the suppression hearing, in the officer's estimation—an "estimation," the Court notes, that hardly qualifies as such, given the vagueness of the officers' responses and their inability to give even a range of speeds at which the cab might have been traveling. The officers did not state that they had received specialized training in estimating the speed of moving vehicles, nor did they state that they had previously been worked an assignment where their main responsibility was to apprehend violators of traffic laws. The officers both stated that on the night in issue, they were assigned to the Bronx Anti-Crime Unit, whose

mission is not to enforce the Vehicle and Traffic Laws, but rather to focus on violent felonies. The officers were not even carrying books of summonses to issue in the event that they observed a traffic infraction. While it is possible that one or both officers did receive such training and are adept at such estimations, it is the government's burden to introduce such evidence or elicit such responses during a suppression hearing, *see Heath*, 455 F.3d at 69, and the government did not do so before this Court.

Finally, courts will credit an officer's testimony regarding firsthand observation of a speeding vehicle if additional, specific details of his or her account confirm that the officer's observation and belief were reasonable. For example, in *United States v. Fuentes*, No. 09 Cr. 860, 2010 WL 707424 (S.D. Tex. Feb. 23, 2010), the defendant argued that police officers' observations that his car was speeding should not be credited because the officers did not pace his vehicle, nor did they have special training in determining the speeds of moving vehicles. *See id.* at *2. The district court nonetheless concluded that the officers' conclusions were supported by sufficient evidence because the officers had testified that they could hear the sound of the vehicle's tires on the road and described the engine as very loud. *See id.* Furthermore, those observations were confirmed by the patrol car's dashboard camera, which registered the sounds of the offending car as "audibly louder" than the passing traffic. *Id.* Similarly, the district court in *United States v. Riley*, No. 07 Cr. 226, 2007 WL 3204063 (D. Neb. Oct. 30, 2007), concluded that probable cause existing to stop a vehicle for speeding where officers' were aware of reports of a vehicle engaging in reckless driving whose description matched that of the vehicle they later detained. *See id.* at *4. Related, courts have credited an officer's observations that a car was speeding when the officers have testified that the car was moving *significantly* in excess of the

speed limit, *see United States v. Banks*, No. 08 Cr. 19, 2008 WL 4194847, at *1 (M.D. Fla. Sept. 11, 2008) (relying on "[a] police officer['s] observ[ation of] a vehicle being driven significantly in excess of the posted speed limit" despite the fact that "the exact speed was not determined")—a trend that is consistent with the New York Court of Appeals' observation in *Pearson*—and when the officer could describe his efforts to catch up to a speeding vehicle by estimating his own excessive speed, *see United States v. Miller*, 589 F.2d 1117, 1128 (1st Cir. 1978) ("Although the deputy never clocked the appellant at speeds 30 miles per hour in excess of the statutory limit, the deputy did know how much head start the appellant had and did know that speeds of 90 miles per hour, at first in a 35 miles per hour zone, were needed to catch the appellant."). Notably and significantly, neither of these rationales are present here: The officers did not testify to additional details that confirm that the cab was speeding, such as screeching tires, *see* Tr. at 42:2–5, and they did not testify that the cab was traveling well in excess of the speed limit. In fact, the officers would only go so far as to say that their own vehicle was "probably" traveling faster than the posted speed limit. *See* Tr. at 19:9.

Instead, this case seems more akin to *People v. Prado*, No. 2798/03, 2004 WL 396488 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 7, 2004). There, two police officers observed a taxi traveling in New York City at a speed that they characterized simply as "an excessive rate of speed." *Id.* (internal quotation marks omitted). Neither officer in *Prado* was able to estimate precisely how fast the cab was going; both were assigned to an anti-crime unit; neither had any particular training or experience that would suggest they were specially able to estimate the speed of cars; and the officers did not take any action, such as pacing the car, that would allow them to estimate the speed of the car. *See id.* The cab driver testified at the suppression hearing that he usually

traveled between thirty and thirty-four miles per hour and that he believed the speed limit to be thirty miles per hour, though he represented that had not reached full speed at the time at the time the police first observed him. *Id.* Despite some dispute as to the posted speed limit in the area—the officers testified that it was either forty or forty-five—the court held that even if the speed limit was as described by the cab driver, it could not credit the officers' ability to discern so finely whether the cab was traveling thirty or thirty-four miles per hour. *Id.* Based upon those facts, the *Prado* court held that the officers' stop of the cab was unsupported by probable cause. The similarities between this case and *Prado* are manifold. There as here, the officers did not use a radar gun, were unable to estimate specifically how fast the cab was traveling, and made no significant observations about the cab other than that it was speeding. Of course, in *Prado*, the cab driver testified credibly regarding his speed; here, the cab driver's testimony was not offered. Even so, the Court considers *Prado* to be instructive in this context.

The ultimate question before the Court, then, is whether the officers' observation here that the defendants' cab was speeding is supported by sufficient indicia of reliability for the Court to credit it as reasonable. That is not the same, of course, as asking whether the cab was, in fact, speeding. However, after a careful review of the evidence, the Court concludes that the government has not met its burden to demonstrate by a preponderance of the evidence that the officers' stop of the livery cab was based upon a reasonable suspicion that the cab was speeding. The Court therefore concludes that the evidence obtained subsequent to the stop must be suppressed.

Despite specific questioning, neither officer was able or willing to provide an estimate as to how fast the cab was going, with both merely stating that the car was traveling "at a high rate

of speed." *See* Tr. at 7:19–20, 19:23–24, 37:7–9. Though Sergeant Whelan stated that the cab was traveling "over 30 miles an hour," *see* Tr. at 19:12, 20:5, he could not offer an approximation of how much more than thirty miles per hour the cab was traveling. Officer Brannigan did not even specify during his testimony that the car was traveling in excess of the speed limit *at all*, confining his answers to only remarking that the cab was traveling at a "high rate of speed." As detailed above, neither officer stated that he had any training in estimating the speed of moving vehicles, and neither described working an assignment where it could be expected that an officer would gain this skill through on-the-job experience.

Nor can the Court rely on a conclusion that the cab was traveling at such a high rate of speed that even a layman would be able to determine that it was speeding; the officers did not state in their testimony that this was so, and the evidence does not support a conclusion that they were traveling so excessively fast that such a conclusion might be drawn. For example, despite testifying that his window was open, Officer Brannigan did not report hearing any screeching tires as the car applied its brakes in making a right turn off the bridge's exit ramp.

In addition, the circumstances of the stop raise further doubts about the reasonableness of the stop of the cab for speeding. Sergeant Whelan testified that he observed the cab for approximately thirty feet before it reached the intersection, and that the officers stopped the cab (after starting from a dead stop and following it) approximately two blocks later. A car traveling thirty miles per hour will travel thirty feet in less than one second. According to Sergeant Whelan, the cab was traveling faster than thirty miles per hour, meaning that he would have less than one second to observe the car as it approached the intersection to determine that it was speeding. The Court concludes that it is highly unlikely that the officers observed the car

traveling at a speed so clearly in excess of the speed limit to the naked eye, either before or after the car slowed down to make a right turn, and that they were still able to catch up to the cab in such a short period of time and distance, despite making a u-turn before beginning to give chase.

In other words, the government asks the Court to determine—based purely on the officers' bare assertion that the car was traveling at "a high rate of speed," without corroborating additional details or specific estimates—that it was reasonable to believe the livery cab was committing the traffic violation of speeding. The Court rejects that request.[6]

For the foregoing reasons, the Court holds that the officers' stop of the livery cab here was not supported by probable cause and that the stop was conducted in violation of the Fourth Amendment. The evidentiary fruit of the stop must therefore be suppressed.

**CONCLUSION**

For the foregoing reasons, the defendants' motion to suppress is GRANTED.

SO ORDERED.

Dated: New York, New York
December 19, 2011

Richard J. Holwell
United States District Judge

[6] Finally, the government argues that even if the officers were mistaken in their belief that a traffic infraction had occurred, the stop could still be justified, citing *United States v. Jenkins*, 452 F.3d 207 (2d Cir. 2006). There, police officers stopped a vehicle because they believed it did not have a rear license plate, as required by law. *Id.* at 209. After stopping the car, the police observed that the car did have a temporary license plate in the rear window of the car, though the temporary plate was poorly illuminated and difficult to read. *Id.* at 211. The Second Circuit upheld that district court's denial of suppression "because the officers had a reasonable but mistaken belief that the SUV lacked license plates . . . ." *Id.* at 212. But *Jenkins* is not on point here. While the officers in *Jenkins* reasonably suspected that the vehicle was in violation of the traffic laws—the car did not, in fact, have a license plate in the usual rear placement—they were mistaken about certain facts—*i.e.*, the car had not actually committed a traffic violation. Here, however, the officers have not articulated sufficient facts to demonstrate that they reasonably believed the cab was in violation of the traffic laws. In other words, there is no "reasonable mistake" in this case.